## STATE OF CONNECTICUT *v.* ANDREW BURTON
### (SC 16348)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued March 21—officially released September 25, 2001

*Carmine Giuliano*, for the appellant (defendant).

*Joy K. Fausey*, deputy assistant state's attorney, with whom, on the brief, were *James Thomas*, state's attorney, and *Thomas Garcia*, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant was tried by a jury on charges of kidnapping in the first degree in violation

of General Statutes § 53a-92 (a) (2) (A),[1] risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1),[2] criminal attempt to commit sexual assault in the third degree in violation of General Statutes §§ 53a-49 (a) (2)[3] and 53a-72a (a) (1) (A),[4] and assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[5] On November 12, 1999, the jury found the defendant guilty of kidnapping in the first degree, risk of injury to a child and criminal attempt to commit sexual assault in the third degree. On January 21, 2000, the defendant was sentenced to twenty years imprisonment, execution suspended after seven years, and ten years probation for kidnapping. Additionally, he was sentenced to five years imprisonment for risk of injury

[1] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[2] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony." Public Acts 2000, No. 00-207, § 6, designated that existing language as subsection (a) of § 53-21 and added subsection (b). For purposes of this opinion, there is no difference between § 53-21 as revised to 1999 and the current version of § 53-21.

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[5] General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person . . . ."

to a child and five years imprisonment for criminal attempt to commit sexual assault, both to run concurrently with the sentence for kidnapping, for a total effective sentence of twenty years, execution suspended after seven years, followed by ten years of probation. On February 7, 2000, the defendant appealed to the Appellate Court, and the case was thereafter transferred to this court. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 29, 1999, at approximately 3 o'clock in the afternoon, the fourteen year old victim and her friends, D and C, were walking on South Street in Hartford on their way home from school. The victim and C dropped D off at his house and continued along South Street. The victim saw the defendant, whom she had known for about three months, drive past them.[6] The girls separated to begin walking toward their respective homes, and the defendant turned his car around and started back in the victim's direction. The defendant drove alongside the victim as she continued to walk home. The defendant told the victim that he needed to talk to her, and he asked her to walk over to the car. She initially refused because her grandmother was waiting for her at home. She then moved closer, and he told her to get into the car. The victim sat in the passenger seat and left the door open. The defendant reached across her, shut the door and drove off. As he drove with his left hand, the defendant held the victim's door shut with his right hand, so that she could not get out. The defendant's right arm was stretched across the victim, pinning her to the seat. The defendant began speaking harshly and graphically to the victim, telling her that he was going to "fuck [her]," "eat [her] out,"

---

[6] The victim described her relationship with the defendant before the incident as "a normal friendship." She further testified that they "used to hang out together [with her friends, mother or brothers and] do . . . stuff that friends would do."

and "leave a mark on [her]." The victim began yelling for the defendant to let her out of the car and started banging on the window. After driving for a few minutes, the defendant stopped the car and turned off the ignition. He turned to the victim and held the passenger door shut with his left hand. The defendant held the victim's face and tried to kiss her. She told him to stop, and he refused. The defendant began to open the victim's shirt, pull down her undershirt and unbuckle her pants. The victim began to hit and scratch the defendant. When she punched him in the stomach, he let go of the car door handle, and the victim was able to get her foot out the door. The victim got out of the car and began running down the block toward her home as the defendant drove away. Upon arriving home, the victim found her grandmother on the telephone with her aunt. The victim told her aunt over the telephone what had happened to her. Her aunt called the police.

The defendant raises the following issues in this appeal: (1) whether § 53-21 is unconstitutionally vague as it applies to the present case; (2) whether the trial court improperly instructed the jury on the elements of risk of injury to a child; (3) whether the prosecutor's comments to the jury during his rebuttal to the defendant's closing argument were improper; and (4) whether the evidence was sufficient to prove, beyond a reasonable doubt, that the defendant had committed kidnapping in the first degree.

## I

## CONSTITUTIONALITY OF § 53-21

The defendant first claims that § 53-21 is unconstitutionally vague as it applies to the present case. The defendant did not preserve this claim at trial, but seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), in which this court held that "a defendant can prevail on a claim of constitutional error

not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." We will review this claim because the record is adequate and the alleged error is of constitutional magnitude, thus satisfying the first two prongs of the *Golding* test. Id. This claim, however, fails on the merits because no constitutional violation clearly exists. We conclude that § 53-21 is not unconstitutionally vague as it applies to the present case and, therefore, that the claim fails under the third prong of *Golding*. Id.

The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution.[7] The Connecticut constitution[8] also requires that statutes with penal consequences provide sufficient

[7] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[8] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

The defendant does not claim that the Connecticut constitution offers greater protection than its federal counterpart with regard to the void for vagueness doctrine. Accordingly, we will view the provisions as essentially coextensive. See *State* v. *Fernandez*, 254 Conn. 637, 652, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001).

notice to citizens to apprise them of what conduct is prohibited. *Packer* v. *Board of Education*, 246 Conn. 89, 98–99, 717 A.2d 117 (1998). "The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 777, 695 A.2d 525 (1997). "If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Internal quotation marks omitted.) Id., 778.

This court previously has concluded that, "the constitutionality of § 53-21 depends upon a determination of the extent to which prior decisions of this court have supplied sufficient guidelines to save the statute from its facial invalidity." *State* v. *Schriver*, 207 Conn. 456, 462, 542 A.2d 686 (1982). "The apparent legislative purpose in combining the two parts [of § 53-21] in a single section was to proscribe two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being." (Citation omitted.) *State* v. *Dennis*, 150 Conn. 245, 250, 188 A.2d 65 (1963). The language of § 53-21 does not limit the prohibited conduct to physical touching of the minor's private parts. "[W]hile a defendant who deliberately and improperly touches the private parts of a minor is clearly a hard-core violator of § 53-21, such conduct is not necessarily the only type of conduct that is proscribed under the statute." *State* v. *Tucker*,

50 Conn. App. 506, 513–14, 718 A.2d 979 (1998), appeal dismissed, 248 Conn. 668, 728 A.2d 1097 (1999).

The defendant claims that this case is analogous to *State* v. *Schriver*, supra, 207 Conn. 466, in which this court concluded that "grabbing the waist of a fully clothed minor while uttering a sexually suggestive remark [namely, 'all I want to do is feel you'] is not the type of lewd conduct that § 53-21 proscribes." We further reasoned in *Schriver* that "the defendant had no reasonable opportunity to know that his conduct was prohibited by the impairment of morals clause of § 53-21." Id. In the present case, however, the language used by the defendant was significantly more graphic and vulgar. Furthermore, the defendant's actions were much more inimical and injurious to the victim's moral well-being than the defendant's actions in *Schriver*. The victim testified that the defendant had pinned her to her seat with his arm as he held her door shut. Furthermore, he began to unbutton her shirt and pull down her undershirt. He also held her face and tried to kiss her, all the while holding her door shut so that she could not escape. This conduct is much more similar to the conduct of the defendant in *State* v. *Tucker*, supra, 50 Conn. App. 514, where "the defendant grabbed the victim's arm and lay on top of her, face to face, while holding his hand over her mouth to maintain her silence during his repeated attempts to force his tongue into her mouth." The Appellate Court held that that conduct was clearly proscribed by § 53-21. Id.

Accordingly, we conclude that the defendant was on sufficient notice that his conduct would be considered "likely to impair" the morals of the victim, and, therefore, § 53-21 is not unconstitutionally vague as applied to this case.

## II

## JURY CHARGE

The defendant next claims that the trial court improperly instructed the jury on the charge of risk of injury to a child, in that the trial court's instruction was overly broad and did not instruct the jury that it had to find that the victim's morals were actually impaired in order to find the defendant guilty. This claim was not preserved at trial, and the defendant again seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the defendant has not shown that a constitutional violation clearly exists and, therefore, that this claim fails under the third prong of *Golding*. Id.

As a preliminary matter, we set forth the standard of review for claims of instructional impropriety: "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 714, 756 A.2d 799 (2000).

The defendant claims that § 53-21 requires that the jury find beyond a reasonable doubt that the child's morals were impaired in order to find the defendant guilty of risk of injury to a child. The trial court instructed the jury that each element of the crime had to be proved beyond a reasonable doubt in order for the jury to find him guilty of risk of injury to a child. Furthermore, § 53-21 does not require a finding that the victim's morals were actually impaired. On the contrary, § 53-21 provides that anyone "who . . . wilfully or unlawfully . . . does any act *likely to impair* the health or morals of any such child" may be found guilty.

(*Emphasis added.*) Indeed, the defendant himself, in his request to charge, asked that the jury be instructed that "no actual impairment of the victim's morals is necessary. The focus is on whether the act was *likely* to impair the morals of the victim." (Emphasis in original.)

The defendant further contends that the trial court's use of the phrase, "shall be punished," rather than "is guilty of this offense" was improper. See footnote 9 of this opinion. Considering the jury instructions as a whole, we conclude that it is not reasonably likely that this minor misstatement by the trial court could have misled the jury in any way.

Finally, the defendant challenges the trial court's instruction that "[t]o establish the defendant did an act likely to impair the health of a minor, the state must prove beyond a reasonable doubt that the defendant committed blatant physical abuse that endangered the child's physical well-being." Section 53-21 describes the situations wherein a defendant may be found guilty of risk of injury to a child: where the defendant "wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . ." In the present case, the state's information charged the defendant with risk of injury to a child by doing an act likely to impair the morals of a child under the age of sixteen. The trial court instructed the jury accordingly.[9] The trial court, however, also charged the

[9] The trial court instructed the jury in part: "Any person who does any act likely to impair the morals of a child under . . . sixteen years of age shall be punished. To find the defendant guilty of [risk of injury to a child], the state must prove the following elements beyond a reasonable doubt: first, that at the time of the incident, the alleged victim was under the age of sixteen years; second, that the defendant did an act that was likely to impair the morals of the child; and three, that the defendant had a general intent to perform such an act. . . . As used here, morals means good morals,

jury with regard to the situation where the child's physical well-being is endangered. Because the defendant was not charged under the physical endangerment section of § 53-21, this instruction was improper. See *State v. Chapman*, 229 Conn. 529, 537, 643 A.2d 1213 (1994) ("it is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute"). Although we conclude that this instruction was improper, a constitutional violation does not clearly exist within the meaning of the third prong of *Golding*.

In *State v. Chapman*, supra, 229 Conn. 537, this court was presented with a similar situation: "The substitute information . . . stated only that the defendant had compelled the victim to engage in sexual intercourse 'by the use of force.' In its charge to the jury, however, the trial court read the entire statute, stating that the jury could convict the defendant of sexual assault in the first degree if it found that he had compelled the victim to engage in sexual intercourse by the use of force or the threat of the use of force." In *Chapman*, as in the present case, the defendant argued that the improper instruction had violated the defendant's federal and state constitutional due process rights.[10] Id., 539. This court concluded that "[t]he instruction . . . charged the jury on compelled sexual intercourse by the threat of the use of force, a legally adequate theory of liability for which there was no evidence . . . [but that] [t]he jurors . . . were in a position to be able to

---

living, acting, and thinking in accordance with those principles and precepts which are commonly accepted among us as right and decent. The state must also prove beyond a reasonable doubt that the defendant had the general intent to perform the act. . . . If you find that the state has proven beyond a reasonable doubt each of the elements of the crime of risk of injury, then you shall find the defendant guilty. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall find the defendant not guilty."

[10] See footnotes 7 and 8 of this opinion.

evaluate the testimony presented and to assess whether the charged theory was supported by the evidence." Id., 540, citing *Griffin* v. *United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991) ("When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence . . . ." [Citation omitted.]). Accordingly, we concluded that there was no constitutional violation and no prejudice to the defendant. *State* v. *Chapman*, supra, 539.

Similarly, in the present case, the state did not present evidence to show that the defendant had committed blatant physical abuse to harm the victim's physical well-being. On the contrary, the state presented evidence that the defendant's actions were likely to impair the victim's morals. Accordingly, we are not persuaded that the trial court's overinclusive jury charge denied the defendant his due process rights. See id. ("a factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation").

## III

## PROSECUTORIAL MISCONDUCT

The defendant also claims that his right to a fair trial was violated by the prosecutor's improper arguments to the jury. The defendant asserts that the prosecutor: (1) vouched for the credibility of the state's witnesses; (2) suggested that the jury draw inferences from facts not in evidence; and (3) made inappropriate comments about missing witnesses and the defendant's inability to present a defense. The defendant did not preserve

these claims at trial, but again seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, or under Practice Book § 60-5,[11] which provides for plain error review. We conclude that the challenged comments did not clearly deprive the defendant of a fair trial, and, therefore, that this claim fails under the third prong of *Golding*.

This court previously has held that "prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." *State* v. *Somerville*, 214 Conn. 378, 393, 572 A.2d 944 (1990). In *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987), this court concluded that, in evaluating a claim of prosecutorial misconduct, we must determine "whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) Factors to consider in this analysis include: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case. Id., 540.

Because we find most of the challenged comments to have been either appropriate or invited by the defendant,[12] and because any improper remarks, taken as a

---

[11] Practice Book § 60-5 provides in relevant part: "The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

[12] The state, in its rebuttal to the defendant's closing argument, described that argument as presenting three categories: "Category one, the testimony of [C] and [the victim] is not identical. Category two, the Hartford police did not perform the investigation the way defense counsel thinks it should have been performed. Category number three, [the victim] didn't behave the way defense counsel thinks a rape victim should behave, the way a fourteen year old girl who had just been [through] the most traumatic experience of her young life should behave."

whole, were not sufficiently prevalent to have established a pattern of misconduct, we conclude that they did not deprive the defendant of a fair trial. Id.; see also *State* v. *Somerville*, supra, 214 Conn. 393 ("[a]lthough certain remarks made by the prosecutor, from hindsight, may be deemed imprudent, such isolated and brief episodes as occurred here fail to implicate the denial of the defendant's constitutional right to due process").

## A

### Vouching for the Credibility of Witnesses

The defendant claims that the prosecutor, in his rebuttal to the defendant's closing argument, improperly vouched for the credibility of the state's witnesses.[13]

---

[13] For the sake of clarity, we will italicize the portions of the rebuttal remarks by the prosecutor that the defendant claims were improper. The prosecutor stated in relevant part: "And who knows how [the victim] should behave? Who knows how they would behave in the same situation? Did she make a bad choice of words when she said she walked home? Maybe she walked home? Who know[s]? . . .

"[The victim] and [C] are two fourteen year old girls. . . . They're recounting an event that occurred ten months ago. *I'd be suspicious if the two of them sat on the stand and gave identical testimony. They didn't do that.* . . .

"[C] was only thirteen at the time it happened. *So they can't come in here and recite the same words. If anything, that adds to their credibility.* . . .

"Now, I think you heard allusions to, well, gee, if we had pants with mud on them, we could bring Henry Lee in. . . .

"If we had pants with mud on them, we know the argument we'd hear. It was January. There's slush on the street. She gets splashed by a passing car. The absence of pants with mud on them means absolutely nothing.

"It's not the type of case and not the type of charges that produce a large amount of physical evidence. I'll concede that. It's a crime that took place in private. *But you have as much corroboration as you can get in an incident like that.*

"You have the observation of her demeanor. You have the fresh complaint to her aunt. You have the statement. You have the fresh complaint to [C] on Monday. . . .

"And this comes down to really the key point in this case. You heard extensive cross-examination of [C]. *Anywhere in the course of this trial have you heard any evidence that there was motive for either one of these girls to fabricate what they told you?*

## The state argues that statements made during its rebut-

*"You haven't heard a single word. . . .*

*"Up until January 29th, you haven't heard one reason why either of these girls would want to say anything bad about [the defendant]. Not a single, single thing. Not one shred of evidence that shows a motive to fabricate.*

"And then some other things didn't make sense to [defense counsel]. Well, you know, why didn't he squeeze her breasts? He had the chance. He was taking her shirt off. There was a struggle. Who knows why he didn't squeeze her breasts? *He probably didn't have time, but that's where he was headed.*

"Why didn't he take her to the park? Why didn't he take her to South Park over here? Well, he's headed down the avenue, and I think she told you there was a park over here where they hung around. But does it really matter that he didn't do it in an intelligent manner? . . .

*"I want to talk a little bit about the credibility of the witnesses. Now, you heard from . . . two officers on the Hartford police department who had never seen this man before. Did they have any motive to fabricate testimony?*

"[C], again, a girl who had just turned . . . fourteen before her testimony, had only known the victim for three months, hasn't seen her since May. Again, a friend of [the defendant] prior to being a friend of [the victim]. *Again, a complete absence of any motive to fabricate.*

"Again, *I submit to you it would be suspicious if they came in here*— [the victim] had testified, yeah, we got to the corner. We said good-bye. [C] went over and she stood right under the stop sign or right next to the stop sign by the Oxbow, and she watched what happened. And then if [C] came in and said, yeah, I said good-bye. I crossed. I went over. I stood right next to the stop sign. I saw what happened.

*"That would be suspicious. That's not what you heard. You heard testimony that was the same in every important detail. You heard testimony that was different in some details, but details that don't matter.*

*"[The victim's aunt], again, no motive to fabricate.* She told you she didn't even know who [the defendant] was when [the victim] called her. . . .

"You got to observe [the victim's] demeanor on the stand. And [defense counsel] *talked about these supposed phone calls [from the victim to the defendant after the incident] . . . that I'll say I don't believe happened.* . . .

"And I don't know if you can recall [the victim's] demeanor on the [witness] stand, but this . . . young girl who was staring almost straight ahead, turned just enough so she could barely see [the defendant in order to identify him]. She did not even want to look at him. . . .

*"Do you think that this girl made repeated phone calls to this man's house after this incident? I don't think so.* This is a guy that set her up. He told her he was eighteen when they met. *You haven't heard anything to contradict that.* The police told you he was almost twenty-one years old when this happened. She had just turned fourteen. . . .

tal to the defendant's closing statements were in response to the defendant's attack on the credibility of the victim and C.[14] We agree with the state.

"*And if [the victim is] trying to set [the defendant] up, she didn't do a very good job. If you want to set somebody up, why not make it a little bit better?* Why not say, he got inside my shirt? He squeezed my breast? He grabbed my crotch? We've been having problems before this. I was afraid of him.

"*None of that. She told you what happened. She didn't exaggerate the incident. She didn't overplay the incident. She just told you what happened.*

"Those are the state's witnesses. *I submit to you they're credible. They're credible because there's simply no reason at all to indicate they're not. No motive to fabricate at all.*"

The specific portions of the state's rebuttal that the defendant claims are inappropriate are italicized.

"You heard about the measurements that were taken in the car, measurements that were taken Monday night after the victim had testified. And we heard about the interior width, and we heard about the width with the door wide open. There's one measurement that was never taken, and . . . . that [defense counsel] had made a lot of.

"What was the measurement from where the edge of [the defendant's] body would have been to the door handle that he would have had to hold to keep the door shut? *That's a measurement that was never taken, a measurement that I would submit is most critical to you because his contention is that,* well, gee, he couldn't have held the door shut and driven the car with one hand. And you know from your own experience that can be done. *You may not have been doing a great job of driving, but it can be done. . . .*

"You'll have the victim's statement when you go back in the courtroom. [sic] Essentially, it boils down the substance of this trial. *Nothing in the substance of that statement has been contradicted. You haven't seen any motive for [the victim] to fabricate or [C] to fabricate. . . .*

"The defendant's entire case rests on you disbelieving [C], disbelieving [the victim], discrediting her statement. And there is no reason that has a foundation in the evidence for you to do that."

[14] Defense counsel stated the following in his closing statement: "[The victim and C] traveled to the north, away from home on Franklin Avenue to the corner of South Street; and . . . this was their normal route home. Strikingly, [C] couldn't remember what the route was, but she did agree that it was she and [the victim] alone who left school and traveled towards South Street.

"On the other hand, [the victim] had told us that plainly, it was [C] and [D]. . . .

"[The victim] tells us that [D] waves good-bye, takes a left, and goes home. That's not what [C] says. [C] told us that they went to [D]'s home . . . and that he was already there. And they stayed for about thirty minutes

In light of the defendant's relatively lengthy attack
on the witnesses' credibility based on inconsistencies
in their stories, it was appropriate for the state to pre-
sent the jury with an alternative to the defendant's sug-
gestion that the witnesses must be lying. Furthermore,
it was within proper bounds for the state to remind the
jury of the witnesses' young ages and the fact that the
incident occurred months earlier, as well as to suggest
to the jury that the fact that the witnesses apparently
had not rehearsed their stories together could be per-
ceived to enhance their credibility. See *State* v. *Holmes,*

. . . . The paths of their stories begin to diverge wider and wider as we
go along.

"[T]hey agree that they saw [the defendant] traveling south on South
Street in the car. But where? I respectfully submit to you that here we have
an 'x' in purple, which was made by [the victim] . . . . That's different
from [C], who puts an 'x' here . . . . That's a pretty big distance. . . .

"[A]ccording to [the victim], if we're to accept her testimony, she and [C]
pretty much—and [the defendant]—have the south end of Hartford, at least
this neighborhood, to themselves. . . . Hmm. [C] points out that, sure, I
saw students. There were kids around, like we would normally expect
hanging around a large school on a Friday afternoon.

"[W]e have here on State's Exhibit 1 an 'x' on approximately the halfway
point of the South Street School property where [the victim] says she saw
and stopped and was finally convinced by [the defendant] to cross the street
and go to his car.

"Well, that's not at all what [C] told us. [C] told us that they both
approached the corner, that they both turned to their right and saw [the
defendant], according to [C], about a minute or two later. . . . And she sat
in this witness stand and told us that she saw [the victim] get into the car
as close as the back row of the spectator seating in this courtroom; that she
was that close off the corner, as presumably [the victim] walked diagonally to
the car. . . . And she could clearly hear what [the defendant] was saying,
that, come on, I need to talk to you. Get in the car, please. . . . Completely
different version of facts by these two critical fact witnesses. We saw him
come back, [C] says, never saw him turn. I'm walking south, [the victim]
says, I'm walking home. I've turned to the left. I'm walking home. The next
thing I see is this guy's right along side me up here in the middle of the
road, following me slowly.

"Creeping along as she would walk, imploring her, come, get in my car.
Didn't happen, according to [C]. . . .

"Their story just doesn't match up. . . . [T]heir stories are that divergent?
Their recollection is that off the beam?"

64 Conn. App. 80, 93, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001) (prosecutor may properly comment on credibility of witness where comment reflects reasonable inferences from evidence adduced at trial). In no way did these comments infringe upon the jury's fact-finding function. Furthermore, the state may properly argue that the witnesses had no apparent motive to lie. See *State* v. *Hicks*, 56 Conn. App. 384, 394, 743 A.2d 640 (2000) (holding that prosecutor's argument that witness had no motive to lie not improper).

We agree with the defendant that it was improper for the state to make the comment, with regard to the alleged telephone calls made by the victim to the defendant after the incident, that "I'll say I don't believe [they] happened." See *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989) ("[w]hile the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses"). This single impropriety, however, was not sufficiently egregious to infect the whole trial. See *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983) ("[t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct").

B

Facts Not in Evidence

The defendant next argues that the state improperly referred to facts not in evidence during rebuttal.[15] Specifically, he argues that the prosecutor's comment that it is possible to hold a car's passenger door shut with

---

[15] See footnote 13 of this opinion.

one hand while driving with the other was improper. The state argues that these comments merely addressed the investigation underlying the case and the type and amount of evidence presented to the jury, in response to what it perceived as assertions by the defendant that "the Hartford police did not perform the investigation the way defense counsel thinks it should have been performed" and "[the victim] didn't behave the way defense counsel thinks a rape victim should behave . . . ."[16] We agree with the state.

The defendant, having initially suggested to the jury that the defendant could not physically have held the passenger door closed while driving, cannot now complain because the state challenged that assertion. Furthermore, in response to the defendant's argument that the limited nature of any physical contact was inconsistent with an intent to assault sexually, the state was within its bounds in arguing that the evidence it presented, although limited, was sufficient to convict the

---

[16] During closing arguments, defense counsel argued: "How would [the defendant] physically close [the passenger door without] coming onto [the victim's] side of the car, reach across and close that door? Suddenly, without warning, by the element of surprise, to lock her in the car?

"We heard [the defendant's] dad testify that it was seventy-four inches. Well, I don't know. I suppose it was his dad. You know how wide a car door opens, and you know that you cannot physically reach across and close the door from the inside without moving at least into the passenger's seat or getting out.

"You just don't do that, ladies and gentlemen. It doesn't stack up. It doesn't make sense. It is implausible.

\* \* \*

"If a man intended to sexually assault a woman—and now I've got her blouse open, and she's got [a] tank top. Bingo. I'm going to fondle her. I'm going to grab her breast. Wouldn't he? If this is what the man's intention was—if this pervert, if this attacker sought sexual gratification . . . .

"She said he didn't grab her breast. Now, she gets out of the car. She grabs her backpack, and of course, we have her testimony, 'I walked home.' But did she run to any one of the houses that surround the crime scene on George Street? No. She made the long trek with the perpetrator still in his car."

defendant. Therefore, we are not persuaded that these comments impaired the defendant's constitutional right to a fair trial.

C

Missing Witnesses and the Failure of the Defendant To Present a Defense

The defendant also claims that, during rebuttal, the state improperly commented on missing witnesses and the defendant's failure to present a defense by suggesting that the state's witnesses lacked any motive to fabricate their stories, mentioning that portions of the state's evidence were not contradicted, and thereby improperly shifting the burden of proof to the defendant.[17]

"[T]he Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); see also General Statutes § 54-84.[18] In *State* v. *Magnotti*, 198 Conn. 209,

---

[17] See footnote 13 of this opinion.

[18] General Statutes § 54-84 provides: "(a) Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence."

In accordance with subsection (b), the trial court instructed the jury: "The defendant has not testified in this case. An accused person has the option to testify or not to testify at trial. He is under no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inference from the defendant's failure to testify."

220, 502 A.2d 404 (1985), "[w]e . . . recognize[d] that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . We regard[ed] the challenged remark as a comment by the prosecutor on the overall quality of the defendant's evidence and not as calling specific attention to the failure of the accused to testify. . . . The accused, by his failure to testify, cannot insulate himself from general comment on the weakness of his case, even though his failure so to testify may be perceived by the jury as having contributed to the general weakness about which comment is made." (Citations omitted; internal quotation marks omitted.)

In this case, the state made no explicit mention of the defendant's failure to testify, the trial court instructed the jury about the defendant's right not to testify, and the state did not comment on the failure of the defendant to present impeachment witnesses. We are not persuaded that the state's comments shifted the burden of proof to the defendant[19] or deprived the defendant of a fair trial.

---

[19] With regard to the burden of proof and reasonable doubt, the trial court instructed the jury as follows: "In this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. This presumption of innocence was with the defendant when he was first presented for this trial in this case. It continues with him throughout this trial unless and until such time as all the evidence produced here in the orderly conduct of the case, considered in the light of these instructions of law and deliberated upon by you in the jury room, satisfies you beyond a reasonable doubt that he is guilty.

"The burden of proof in this case, or the burden to prove the defendant guilty of the crime with which he is charged, is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged. . . . Please bear in mind that one witness' testimony is sufficient to convict if it establishes all the elements of a crime beyond a reasonable doubt."

It should also be noted that all of these remarks were confined to the state's rebuttal to the defendant's closing argument, further indicating that no pattern of misconduct pervaded the proceedings. See *State* v. *Alexander*, 254 Conn. 290, 308, 755 A.2d 868 (2000) ("[w]e also emphasize the fact that the improper comments were made during both the prosecutor's initial summation and later rebuttal argument . . . [a]ccordingly, this was not a case in which the defendant's comments during closing argument invited the prosecutor's comments in response"). Because we conclude that the state's remarks did not deprive the defendant of a fair trial, this claim fails under the third prong of *State* v. *Golding*, supra, 213 Conn. 239–40.

Furthermore, we are not persuaded "that the defendant has illustrated the existence of a manifest injustice, such that we would apply plain error review."[20] *State* v. *Lemoine*, 256 Conn. 193, 208, 770 A.2d 491 (2001). "Plain error review is reserved for truly extraordinary situations . . . and is not even implicated unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 166, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). We are not persuaded that the present case presents this type of extraordinary situation.

## IV

## SUFFICIENCY OF THE EVIDENCE

Last, the defendant claims that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he had the requisite intent to commit kidnapping in the first degree. We disagree.

---

[20] See footnote 11 of this opinion.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 224, 733 A.2d 156 (1999).

To find the defendant guilty of kidnapping in the first degree in violation of § 53a-92 (a), it was necessary for the jury to find all of the following elements to be proven beyond a reasonable doubt: (1) the defendant had abducted someone; and (2) had restrained that person with the intent to inflict physical injury upon him or abuse him sexually.[21] General Statutes § 53a-91 defines the critical terms of § 53a-92 (a) and provides in relevant part: "(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement.

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found,

---

[21] See footnote 1 of this opinion.

or (B) using or threatening to use physical force or intimidation. . . ."

We conclude that the evidence presented to the jury was sufficient to find the defendant guilty of kidnapping in the first degree. The victim testified that the defendant had held her door shut with his right arm, thereby pinning her to her seat as he drove away. Additionally, she testified that he had ignored her screams to stop the car and let her out. Thus, the jury reasonably could have found that the defendant had used both physical force and intimidation to interfere with the victim's liberty and confine her to the car. See *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977) (no time or distance requirement to constitute asportation in finding sufficient evidence of kidnapping). The jury also could have found sufficient evidence in the victim's testimony that the defendant had abducted and restrained her. See *State* v. *Corbin*, 61 Conn. App. 496, 518, 765 A.2d 14, cert. granted, 256 Conn. 910, 911, 772 A.2d 1124, 1125 (2001) (evidence sufficient to support kidnapping conviction where defendant lured victim into wooded area by deception and proceeded to assault her sexually, and placed his hand over her mouth, threatening that if she screamed, he would kill her); *State* v. *Faria*, 47 Conn. App. 159, 187–88, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998) (sufficient evidence to support kidnapping conviction where victim tried two or three times to reach for car door but defendant forcibly held her back by her hair, when victim got her feet out door, defendant grabbed her by her hair and shirt in apparent attempt to restrain her, and victim pushed and pulled "with everything [she] had and was able to break free as her shirt ripped in the defendant's hand").

The victim's testimony also reasonably could have provided the jury with sufficient evidence of the defen-

dant's intent to abuse her sexually. It is difficult to prove intent because "direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000). In the present case, however, the jury reasonably could have inferred from the substance of the victim's testimony that the defendant had intended to abuse the victim sexually. The victim stated that the defendant grabbed her face and tried to kiss her, hurting her face in the process. Furthermore, the victim testified that while the defendant was holding her in the car against her will, he stated that he wanted "to fuck [her]," "eat [her] out," and "leave [his] mark on [her]." We conclude that the jury reasonably could have found beyond a reasonable doubt that this evidence reflected the defendant's intent to restrain the victim in order to abuse her sexually. See *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984) ("We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility.").

Because we find that the jury reasonably could have concluded, beyond a reasonable doubt, that the defendant had the requisite intent to restrain the victim for the purpose of sexually abusing her, this claim fails.

The judgment is affirmed.

In this opinion the other justices concurred.