MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of Ralph O., the biological father of Jennifer O., born July 1990.[2] The Department of Children and Families (DCF) filed the TPR petition against Ralph O. on August 7, 2001, alleging failure to rehabilitate and lack of an ongoing parent-child relationship. For the reasons stated below, the court finds the TPR issues against Ralph O. in favor of the petitioner.
The history of the file reflects that DCF obtained custody of Jennifer through a 96-hour hold followed by an Order of Temporary Custody (OTC) entered by the court in 1996. In 1997, Jennifer was found to be neglected and was committed to DCF. She has been maintained in DCF custody since that date.
Trial of this highly-contested matter took place on April 25 and 26, 2002. The petitioner and Ralph O. were vigorously represented throughout the proceedings, as was the minor child.[3] On or before June 24, 2002, all counsel submitted thorough, comprehensive briefs addressing the legal and factual issues that had been raised at trial.
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of Jennifer.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR CT Page 13305 social study[4] and the multiple other documents submitted in evidence which included documents reflecting court action, records and correspondence from the Department of Corrections (DOC) and Department of Public Safety, DCF records, other correspondence, resumes, and psychological reports. The court has utilized the applicable legal standards[5] in considering this evidence and the testimony of trial witnesses, who included corrections officers, a foster mother, a DCF worker, a licensed clinical social worker and the respondent. In addition, the court had the opportunity to meet with Jennifer, and the GAL provided a report for the court. Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
 I.A. PROCEDURAL EVENTS PRIOR TO THE TPR ADJUDICATION OF JULY 11, 2000
The file reflects that DCF obtained custody of Jennifer as the result of a Order of Temporary Custody (OTC) application submitted in 1996, based on allegations that she had been sexually abused by a live-in maternal uncle, and that she was denied proper care and attention physically, emotionally and morally. On March 5, 1997, Jennifer was adjudicated a neglected child (Jones, J.); she was committed to DCF custody, and has remained in the agency's care thereafter, pursuant to orders of the court. (Exhibit 1.)
On April 7, 1999, the court (Alander, J.) found by clear and convincing evidence that efforts at reunification of mother or father and daughter were no longer appropriate. The original TPR petitions against both Gladys H. and Ralph O. were tried to the court (Rogers, J.) in June 2000. As noted above, the parental rights of Jennifer's mother, Gladys O., were terminated by the court (Rogers, J.) on July 11, 2000, but the pending TPR petition against Ralph O. was withdrawn prior to completion of the evidence.
On December 4, 2000, the court (Esposito, J.) again found that it was not appropriate to continue efforts to reunify Ralph O. and his daughter. (Exhibit 1.)
 I.B. RALPH O., THE FATHER
Ralph O. was born June 15, 1965. He has completed the seventh grade, and has been incarcerated for much of his adult life. While confined at the DOC, he has worked as a painter, tierman, food cart operator and foodserver, floor detail and garbage worker; he has also worked at manual labor. (Exhibits 1. E.) CT Page 13306
As noted in Part I.A., although trial of a previous TPR petition had commenced against Ralph O. in 2000, those issues were not formally resolved at trial. Subsequently, on August 7, 2001, the pending TPR petition was duly filed and served upon the respondent. Specific steps for Ralph O.'s rehabilitation were imposed by the court (Brenneman, J.) and received by the respondent on August 17, 2000. Among other things, those steps required the respondent to participate in parenting counseling after successful completion of "Northern Correctional Institute's Gang Member/Close Custody Program." (Exhibit 2.)
Ralph O.'s lengthy history of involvement with the criminal justice system in this state commenced years before Jennifer's birth on July 1990 and has continued to the present. In 1982, when he was seventeen years old, he was sentenced to two years of incarceration, suspended after six months, for convictions of Burglary in the third degree and violation of probation. In 1983, he received a consecutive one year sentence for conveying contraband into a correctional institution. In 1985, he received a seven year jail sentence, suspended after forty-two months, for conviction of Burglary in the second degree, with concurrent sentences of three years in jail for conviction of violation of probation, two years in jail upon conviction for Larceny in the second degree and six months in jail upon conviction for Larceny in the fourth degree.[6] In 1988, he was convicted of Failure to Appear in the first degree, and received a sentence of three years in jail, and he received a small fine upon conviction for Resisting Arrest. In 1990, he was sentenced to serve thirty months in jail upon conviction for Sale of Narcotics and one year for Escape in the first degree, in connection with offenses that had occurred on July 6, 1990, days before Jennifer's birth.[7] On April 30, 1993. as Jennifer's first birthday drew near, upon conviction of two counts of Assault in the first degree, one count of Burglary in the first degree, and two counts of Robbery in the first degree. Ralph O. received concurrent sentences of seventeen years in jail, suspended after twelve years with three years of probation.[8]
(Exhibit 3.) Commencing in 1993, Ralph O. was housed at Walker RSMU, Garner CI, New Haven CCC, Garner CI, Cheshire CC, MacDougall CI, Corrigan CI, Garner CI, Corrigan CI, Osborn CCI, and Garner CI. In July 2000, near the time of the first trial involving TPR allegations against him, Ralph O. made threats upon the staff of the correction facility where he was housed.[9] In response, Ralph O. was transferred to Northern CI, a maximum security DOC facility.[10] (Exhibit 5; Testimony of Michael R.) However, because Ralph O. had problems dealing with gang members who were also incarcerated at Northern CI, he was transferred to protective custody at Cheshire CC on January 30, 2001. He remained incarcerated at Cheshire CC at the time of trial. (Exhibit 5; Testimony of Michael R.). CT Page 13307
From the foregoing, it is overwhelmingly apparent that Ralph O. has spent the vast majority of the past twenty years serving sentences of incarceration for crimes he has committed in a near-repetitive fashion whenever he was at liberty. The evidence also clearly and convincingly establishes that he has continued his pattern of misconduct and offenses against persons and property even while serving his jail sentences. Ralph O.'s disciplinary history with the DOC reflects his receipt of thirty-six disciplinary reports or "tickets" during the period of 1987 through December 1, 2000.[11] (Exhibit 4.) From 1996, when Jennifer was taken into DCF custody, through August 7, 2001 when the pending TPR was filed, Ralph O. engaged in numerous rule violations and became subject to the following penalties, many of which limited or eliminated his ability to maintain contact with his daughter.[12] On February 3, 1997, for fighting, Ralph O. was subject to loss of telephone privileges and good time, was placed in punitive segregation for seven days and was confined to his unit for fifteen days. On February 7, 1997, for maintaining his SRG affiliation Ralph O., was subject to loss of good time, was placed in punitive segregation for fifteen days, was confined to his unit for fifteen days, and lost visiting privileges for thirty days. On July 17, 1998, for assault, Ralph O. was placed in punitive segregation for twenty days, confined to his unit for thirty days, and lost visiting privileges for sixty days, through October 2, 1998. On July 27, 1999, for conspiring to interfere with the prison's safety/security, Ralph O. was placed in punitive segregation for fifteen days, lost visiting privileges for sixty days, and lost communication privileges for ninety days. On July 28, 1999, for security tampering, Ralph O. lost telephone privileges for sixty days. On July 29, 1999, for disobeying a direct order, Ralph O. was placed in punitive segregation for ten days. On June 21, 2000, for presenting an SRG safety threat, Ralph O. was placed in punitive segregation for twenty days, lost telephone privileges for thirty days, and lost visiting privileges for thirty days, through August 9, 1999. On December 1, 2000, for fighting, Ralph O. was placed in punitive segregation for twenty days, lost telephone privileges for ninety days, and lost visiting privileges for sixty days, through February 19, 2001. (Exhibit 4; Testimony of Jeff C.)
Although he received no disciplinary actions after December 2000, the evidence clearly and convincingly reflects that Ralph O. is affected by an entrenched pattern of major and minor rule violations which had persisted for approximately fourteen years notwithstanding the imposition of significant DOC penalties. (Exhibits 4. 5; Testimony of Jeff C.) Given his history of repeated violations while incarcerated, the DOC has estimated that Ralph O. will not be released prior to April of 2005, consistent with his maximum date of incarceration, April 16, 2005.[13]
(Exhibit 5.) CT Page 13308
During his long stay with the DOC, Ralph O. has participated in a number of classes and instructional programs.[14] While he was confined at Northern CI, Ralph O. was held in a unit where for a time he participated in the "Northern Correctional Institute's Gang Member/Close Custody Program." This program was directed at education of inmates, such as gang members, for whom threats of violence are an issue. Although the specific steps called for his completion of this program, Ralph O. left the program prematurely, due to the DOC's decision to remove him from the Northern CI facility, and to transfer him to Cheshire. (Exhibits 2, 5; Testimony of Jeff C.)
 I.C. JENNIFER O., THE CHILD
Jennifer was born to Gladys H. and Ralph O. on July 1990. She was never in her father's custody and came into DCF care in 1996, just before her sixth birthday. DCF facilitated visits between Jennifer and her father at his place of incarceration in July 1997 and November 1998. These "two visits were extremely traumatic for Jennifer." (Exhibit 1; see also Exhibit F.) As found in Part I.A., she was adjudicated a neglected child on March 5, 1997.
Initially, Jennifer was placed in a series of foster homes that each proved unable to provide her with long-term care. On June 28, 2001, she was placed together with her half-sister Sandra C. in Luz O.'s foster home, where they had been placed temporarily on a previous occasion.[15]
Jennifer and Sandra are very firmly bonded to each other, although they engage in a substantial degree of behavior consistent with sibling rivalry. (Exhibits 1, A.; Testimony of Luz O.) Luz O. was unable to adopt the girls, and thereafter they had multiple short-term placements together. On August 3, 2001, Jennifer and Sandra were placed together in foster care with Sonia B. (Exhibit A.) In January 2002, the sisters were placed together in the care of their foster mother, Jacqueline, where they remained at the time of trial.
The court met with Jennifer on April 26, 2002.[16] She appeared as an exuberant, healthy and bright pre-adolescent who communicated openly and without guile. Jennifer calls her foster mother "Mom" and appreciates the assistance Jacqueline provides with her homework; Jennifer enjoys middle school although she dislikes the amount of homework she receives, and reports that math and science are challenging subjects. In the past, Jennifer has exhibited some difficulties in school and when interacting with other children; she was noted to have poor boundary definition, demanding constant supervision. (Exhibits A. B.) Jennifer advised the court that she now has a close friend her own age, with whom she plays CT Page 13309 sports and video games, and passes time on the weekend.
In late 2001, following the first TPR trial, Jennifer stated that she wished to go to live with Ralph O. when he is discharged from prison: the child's statements were clearly made in response to Ralph O.'s representations that he would purchase a home, with a swimming pool and a bike, and that he would live in this new home with Jennifer and her sister Sandra, whom Ralph O. proposed, without basis, that he could adopt. (Exhibit A.; Testimony of Luz O.) When Jennifer learned that Ralph O.'s promises were not likely to be fulfilled in the foreseeable future, she lost all interest in visiting with him. (Testimony of Luz O.) Jennifer is very happy living in the home with Sandra and her foster mother, Jacqueline, whom she calls "Mom." She clearly advised the court that she wants to remain living in her present placement, and that she has no desire to see any members of her family except her siblings.[17]
In the past, Jennifer has received individual counseling from Rosario C., and from Yoom I. at Yale Child Study Center. (Exhibit 1.) On January 30, 2002. Jennifer commenced individual counseling with Karyn E., a clinical social worker associated with Family Centers, Inc.[18]
Jennifer has a great deal of difficulty with the counseling process, indicating that she is unwilling to discuss any issues related to her biological father. Karyn E. sees Jennifer as having a great deal of difficulty trusting others and forming lasting attachments. She has diagnosed the child with Reactive Attachment Disorder, a condition that develops when children are neglected or abused by their primary caretaker, leaving them with diminished capacity to bond with substitute caretakers or authority figures. As the result of treatment sessions, placement with Jacqueline and separation from Ralph O., Jennifer has recently begun to show some improvement in the oppositional and argumentative behavior she previously exhibited at school and in her residential setting. She continues to struggle in school, but is making a genuine effort to succeed, pleasing both herself and her teachers as well. (Testimony of Karyn E.)
I.D. PSYCHOLOGICAL EVALUATIONS
Two relevant evaluations in this matter have been conducted by a court-appointed psychologist, Julia Grenier, Ph.D. Dr. Grenier conducted an interactional evaluation of Ralph O. and Jennifer on January 28, 2000 when the child was nine and a half years old. At that time, Jennifer recognized Ralph O. as her father, and showed some curiosity about him. (Ex. I.) However, she was "somewhat uncomfortable with [him], and does not appear to see him as her psychological father." (Exhibit I; see also Exhibit F.) CT Page 13310
On October 10, 2001, Dr. Grenier again observed and evaluated the interaction between Ralph O. and Jennifer. The psychologist noted that Ralph O. was consistent and positive in his interactions with Jennifer during this visit. (Exhibit F.)
 II. ADJUDICATION
In the adjudicatory phase of these proceedings.[19] the court has considered the evidence related to circumstances and events prior to August 7, 2001, the date upon which the TPR petition against Ralph O. was filed, insofar as the allegation pertaining to lack of an ongoing parent-child relationship against Ralph O. is concerned.[20] With regard to the allegations of failure to achieve rehabilitation brought against, the court has also considered the evidence and testimony related to circumstances occurring through the close of trial.[21] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to Ralph O.
II.A. LOCATION AND REUNIFICATION EFFORTS
The court reiterates the finding made in Part I.A., establishing on April 7, 1999 and again on December 4, 2000 the court had ruled that further efforts at reunification would no longer be appropriate for the respondent with regard to this child. In addition, the court now finds that the petitioner has met her burden of proving, by clear and convincing evidence, that such reasonable efforts as were practicable under the circumstances[22] were made to locate and reunify Ralph O. with Jennifer, as is required by General Statutes § 17a-112 (j) (1)[23]
Ralph O.'s nearly continuous incarceration rendered him largely unavailable for participation in such services. Insofar as the parenting counseling called for by the specific steps was concerned, DCF was neither authorized nor capable of providing this service to Ralph O. during any period relevant to this case.[24] Pursuant to General Statutes § 18-81, the Commissioner of Correction, not DCF, is responsible for providing "treatment, vocational and academic education" programs to individuals like Ralph O., when they are incarcerated.[25]
DCF further fulfilled its obligation to make reasonable efforts to reunify Ralph O. with Jennifer by providing those father-daughter visits at his place of incarceration which were practicable and appropriate under the circumstances of this case.[26] See In re Roshawn R., supra,51 Conn. App. 56-57. Although Ralph O. has filed a number of motions requesting Superior Court orders for visitation with his child, due to his continued imprisonment, in this case the circumstances, conditions and CT Page 13311 frequency of father-daughter meetings were all governed by the DOC.[27]
(Exhibit B.) Ralph O.'s repeated transfers among DOC facilities made coordination of visitation by DCF a significantly burdensome task. Since Ralph O. has been incarcerated for most of the child's life, visitation always required transportation of Jennifer to any visits that could be scheduled, even if the respondent was being held at some distance from the child's foster home. Moreover, as found in Part I.B., Ralph O.'s chronic violation of prison rules led to frequent imposition of sanctions, including recission of visiting and telephone privileges; these penalties often rendered him inaccessible to the child. Furthermore, although DCF has attempted to accommodate Ralph O.'s desires for visitation with Jennifer, the agency was statutorily bound to meet the best interests of the child, whose anxiety and discomfiture concerning prison visits, as found in Part I.C., caused such visits to be limited in number and duration.[28]
Moreover, based on the clear and convincing evidence of the circumstances present in this case, the court finds that Ralph O. was either unable or unwilling to benefit from reasonable reunification efforts. § 17a-112 (j) (1). The evidence is replete with indicia of Ralph O.'s fundamental oppositional and uncooperative relationship to authority figures, providing a firm basis for the determination that this respondent cannot or will not effectively utilize such services when they are extended. Ralph O.'s lengthy history of repeating criminal acts, his resultant incarceration during a great part of Jennifer's's lifetime, and his status as a persistent larceny offender indicate that he has little or no ability or willingness to modify his behavior in a positive way notwithstanding the multiple opportunities for rehabilitation he has received through repeated sentences of probation and incarceration. This inability or unwillingness to conform his conduct to acceptable norms is found in the clear and convincing evidence establishing that Ralph O. exhibited repeated misconduct notwithstanding the imposition of numerous disciplinary "tickets" and sanctions during his long periods of incarceration.[29]
In determining that Ralph O. is unable or unwilling to benefit from reasonable reunification efforts, the court credits the relevant evidence adduced through Dr. Grenier, the court-appointed psychologist who examined Ralph O. on January 28, 2001 and October 10, 2001, as set forth in Exhibits F and I. Dr. Grenier's detailed expert testimony and cogent, well-founded opinions provided clear and convincing evidence that Ralph O.'s personality style reflects prominent risk-taking features, persistent minimization of his obvious history of criminal offenses and rule violations, and a concomitant limited ability or willingness to cooperate with structure and reasonable, corrective discipline when it is CT Page 13312 imposed upon him. Dr. Grenier's opinions establish a firm basis for the court's conclusion that Ralph O. is so entrenched in his ways, and so resistant to positive change promoted by institutional guidance or rehabilitation efforts, that he is psychologically unable or unwilling to benefit from any reasonable reunification services. (Testimony of Dr. Grenier.)
Although Ralph O. argues that DCF failed to place Jennifer with a family member, the evidence clearly and convincingly reflects that DCF made reasonable, albeit unsuccessful, efforts to secure a relative placement. In October 2001, following the first TPR trial, Ralph O. identified his sister Rosa O. as a possible placement for Jennifer. DCF met with Rosa O. and provided her with information regarding the licensing process. However, Rosa O. never completed this process, which was a reasonable prerequisite to DCF's modification of Jennifer's placement.[30] Although DCF was also contacted by Alexis D., whom Ralph O. had recently identified as his half-sister, she was previously unknown to Jennifer. Furthermore, Alexis D. informed DCF that "[s]he was not sure if she [was] interested in [being] a resource for Jennifer." (Exhibit A.) Although Ralph O. suggested his mother Maria O. as a placement resource for Jennifer, DCF reasonably determined that her medical needs rendered her inappropriate as a foster mother at this time.[31] (Exhibits A, F.) Monin H., who was the caretaker for Maria O., also suffered from medical conditions that made it impossible for her to accept responsibility for Jennifer's care. Ralph O.'s brother-in-law Jose B., was proposed as a placement resource by the respondent, but was reasonably determined to be unsuitable as a caregiver, based upon his history of criminal activity. (Exhibit B.) While Jennifer knows some of her relatives and had, in the past, consistently asked to visit with them, she has not made any such requests since her placement with Jacqueline. (Exhibit A.) Clearly, it would not have been reasonable for DCF to place Sandra with any of these relatives.
Ralph O. has argued that the court is precluded from finding that DCF made reasonable efforts to reunite the family in this case, because DCF submitted a permanency plan indicating its contrary intention to have his parental rights terminated, mere months after the commencement of the first TPR trial and the issuance of his specific steps. This argument must fail on several grounds. The court initially observes that the issuance of specific steps is not a predicate to the termination of parental rights under the circumstances of this case, as discussed in Part II.B. of this opinion.[32] In re Vincent D., 65 Conn. App. 658, 670,783 A.2d 534 (2001). In addition, despite Ralph O.'s vigorous argument, the law clearly obliges DCF to provide reunification services while, at the same time, requiring the agency to plan for Jennifer's future in the CT Page 13313 event that reunification efforts fail. See In re Jonathan M., supra,255 Conn. 241 fn31; 42 U.S.C.A. §§ 671 (a) (15) (B) and (F); General Statutes § 17a-110a (a). So-called "concurrent planning" which contemplates both termination and provision of reasonable efforts for reunification of parents and child is clearly appropriate under both Connecticut law and the applicable federal statutes.[33] In this case, DCF met its dual obligation through its November 1, 2000 submission of the Motion for Review of Permanency Plan at issue (Motion for Review), seeking permission to submit a TPR petition, so that Jennifer could be placed in an appropriate pre-adoptive home. That motion referenced the court's April 1999 ruling that it was not appropriate to extend reasonable efforts for reunification of Ralph O. and Jennifer, and could reasonably be examined in the light of Ralph O.'s continuing long term obligation to remain in DOC custody. While the Motion for Review served as an effective predicate to submission of the new TPR petition against Ralph O., DCF's obligation to provide him with reasonable reunification efforts was suspended through another court action, the court's ruling on December 4, 2000, as found in Part I, A.
Furthermore, under the circumstances of this case, where Ralph O. has been incarcerated throughout most of his daughter's life, and where there is no reliable evidence to indicate that he will be eligible for release from incarceration for another three years, it is unreasonable to expect that DCF should defer its statutory obligation to act in the child's best interests by waiting to submit a permanency plan that would realistically meet Jennifer's needs for permanency in her placement. The respondent has provided no valid authority in support of his proposition that DCF's duty to propose termination of parental rights, as a part of a permanency plan, is per se inconsonant with the agency's obligation to provide reasonable reunification efforts.[34] In the face of Jennifer's special psychological needs, Connecticut's case law and legislation which promote concurrent planning, and in the absence of authority to the contrary, the court declines to accept Ralph O.'s argument that the instant TPR action must fail because such planning was in effect in this case.
II.B. STATUTORY GROUNDS FOR TERMINATION — PARENTAL FAILURE TOREHABILITATE — § 17a-112 (j) (3) (B)
The petitioner first alleges that Ralph O.'s parental rights should be terminated because he has failed to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B).[35] Ralph O. counters that he has met the pivotal elements of his specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in his daughter's life. As Jennifer was found to be neglected in 1997, the critical issue for this court is whether the respondent has achieved rehabilitation in CT Page 13314 the statutory sense. Applying the requisite legal standards,[36] and construing the statute in accordance with § 17a-112 (p),[37] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Ralph O. has yet to achieve a sufficient degree of rehabilitation with regard to his fundamental issues of anger management and oppositional conduct as would encourage the belief that he could assume a responsible position in Jennifer's life at some reasonable date in the future. See In re Daniel C., 63 Conn. App. 339, 354,776 A.2d 487 (2001); In re Ashley S., supra, 61 Conn. App. 665; In reSarah Ann K., supra, 57 Conn. App. 448. First, as found in Part I.B., the evidence clearly and convincingly establishes that Ralph O. will remain incarcerated, subject to DOC control, for approximately two and a half more years. His length of imprisonment may be increased if he repeats any of the aggressive or uncooperative behavior which he has exhibited so many times during previous periods of incarceration. As a practical matter, for so long as he remains in DOC custody, Ralph O. will lack the capacity to serve as a responsible parenting resource for his daughter, as he will not be available to meet the child's particular needs, including her need for continued supervision, nurturing and psychological services.[38] During his incarceration, Ralph O. will not physically be present to assist Jennifer in learning to develop her own valid set of life skills, and he will be manifestly unable to provide her with the consistent emotional support she will require as she emerges from childhood into her adult years. Ralph O. is currently scheduled for discharge from the DOC in the spring of 2005, when Jennifer will be nearly fifteen years of age. Given Jennifer's age and needs, it would be unreasonable and inappropriate to require her to wait for Ralph O. to be discharged from the prison system, before enabling her to be permanently placed in a stable, secure, and loving home; this child, who has lingered in foster care for so long, "should not be further burdened by having to wait for her [father] to achieve the level of competency necessary to parent her. . . ." In re Amneris P., supra, 66 Conn. App. 385.
Second, the evidence related to Ralph O.'s psychological functioning clearly and convincingly establishes that he has not achieved § 17a-112
(j) (3) (B) rehabilitation. Dr. Grenier had the opportunity to observe Ralph O. with Jennifer during the interactional evaluation of October 2001, soon after the pending TPR petition was filed, and at or about the time he had completed an inmate's course in life planning skills, as described in Part I.B.[39] Describing Ralph O.'s extant mental health issues, Dr. Grenier credibly observed that the respondent then demonstrated no change in his psychological condition from that which was apparent at his court-ordered evaluation in January 2000, nearly two years CT Page 13315 earlier. Dr. Grenier opined: "The interview with [Ralph O.] does not indicate that he is suffering from any serious emotional problems. His interactions, however, suggest that the findings of the previous evaluationcontinue to be evident in that he demonstrates a tendency to become situationally depressed, and shows antisocial and borderline personality traits." (Emphasis added.) (Exhibit F.) The court fully credits and adopts Dr. Grenier's opinion that given Ralph O.'s continued imprisonment, limited access to mental health services, and the child's age and mental health needs, from a psychological standpoint the respondent "will not be able to undertake a responsible role in Jennifer's life within a reasonable period of time."[40] (Exhibit F.) Overall, this aspect of the evidence clearly and convincingly establishes that due to his chronic incarceration, and his underlying personality issues, Ralph O. was psychologically no better able to assume the responsibilities of parenting Jennifer at the time the instant TPR petition was filed, or at the time of trial, than he had been at the time of the child's commitment. As such, he has not achieved rehabilitation in the statutory sense. In re Hector L., supra, 53 Conn. App. 367.
Third, the empirical evidence clearly and convincingly indicates that Ralph O. has not achieved a sufficient degree of insight or skills necessary to enable him to live in a peaceable manner in the future, integral to serving as a safe caretaking parent for a child such as Jennifer.[41] Given his history of criminal conduct and his past record of violating rules while incarcerated, when the specific steps were imposed in August 2000 it was manifestly obvious that in order for him to become a viable caretaker for Jennifer, Ralph O. "would need to . . . avoid disciplinary problems" with the DOC. Petitioner's Brief. However, even though the steps were put in place, Ralph O. remained unable to keep himself free from violent behavior. Rather than responding to the court's action by behaving in a lawful manner, compatible with safe parenting, Ralph O. became involved in a fight at the prison facility where he was being held in December 2000, as described in Part I.B. As a result, mere months after the specific steps were put in place, Ralph O. received yet another DOC disciplinary ticket, was returned to punitive segregation for twenty days, lost social visiting privileges for sixty days, and lost telephone privileges for ninety days. (Exhibit 4.)
While the evidence does reflect that Ralph O. has not incurred another DOC ticket since December 2000, the evidence also clearly and convincingly establishes that his pattern of major and minor rule violations during incarceration is markedly ingrained, having lasted from 1987 through 2000.[42] This pattern of behavior survived the imposition of a variety of punishments, transfers from institution to institution, and the DOC programs in which he was involved.[43] (Exhibits 4, 5; CT Page 13316 Testimony of Jeff C.) Ralph O.'s history of past misconduct and his failure to timely respond to the DOC's efforts at modifying his behavior provide a firm basis for discerning that despite his very recent demonstration of cooperative conduct in the prison setting, he is unable or unwilling to learn from his past mistakes, so that he remains largely unequipped for living in a peaceful and law abiding manner. Such manifest characteristics are clearly inimical to the demeanor and mien reasonably associated with valid parenting behaviors.
It is fundamental that "in assessing rehabilitation, the critical issue is not whether the parent improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." (Quotation marks and citation omitted.) In re Amneris P., supra, 66 Conn. App. 384. Even if Ralph O. has recently achieved some degree of stable functioning within the confines of the DOC, the evidence in this case clearly and convincingly establishes that any personal gains he may have achieved "were not made in a timely way so as to assist [his] child."[44] In re Amneris P., supra, 66 Conn. App. 384. The court credits the clearly expressed opinion of Jennifer's skilled and experienced licensed social worker therapist, Karyn E., indicating that this child's particular psychological needs render it absolutely necessary that she be raised in a secure and permanent home, with predictable, consistent expectations for her behavior, and a reliable system of physical and emotional support. (Exhibit 6; Testimony of Karyn E.) Given the consistent "habits and acts of misconduct" that marked his past conduct both during incarceration and while at liberty in the community, and his manifest lack of information about or skills with which to manage Jennifer's mental health needs, it would be unreasonable for the court to find that Ralph O. has acquired or developed the capacity to conduct himself in a reasonable manner and to responsibly parent his child when he is discharged from prison in 2005. See In re Michael D., supra, 58 Conn. App. 124-25.
On this basis, the court finds, by clear and convincing evidence, that Ralph O. has not yet achieved statutory rehabilitation and that he is unlikely to accomplish this goal in the reasonably foreseeable future. Inre Daniel C., supra, 63 Conn. App. 353. As stated by Dr. Grenier, the court appointed psychological evaluator, even after his release from prison, Ralph O. "will require further time in order to establish a stable life." (Testimony of Dr. Grenier; Exhibit F.) His need to build a stable life, outside the DOC system, renders the respondent's ability to care for Jennifer even more remote. (Exhibit F.) Even if Ralph O. should become immediately able to actively engage in rehabilitation within the confines of the DOC system in an attempt to develop effective parenting skills, those efforts would be "too little and too late" for Jennifer, CT Page 13317 given the many years that have passed since her adjudication as a neglected child in 1997. In re Sheila J., 62 Conn. App. 470, 481-82,771 A.2d 244 (2001). To wait any longer for her father to achieve the capacity to serve as a responsible parent would unreasonably and unnecessarily force Jennifer to continue to endure for an additional time the insecure status of foster care, a position she has occupied for six years.
Ralph O. vigorously decries the clear and convincing evidence which supports the petitioner's allegation that he has failed to achieve statutory rehabilitation. He protests that the court should pay little heed to evidence reflecting his DOC records and disciplinary "tickets," arguing that the penalties were wrongly assigned to him because he has never violated prison rules or acted aggressively while incarcerated.[45]
(Testimony of Ralph O.; compare Exhibits 4, 5.) At trial, Ralph O. assertively testified that each of his disciplinary reports was due to an "error in judgment" on the part of DOC administrators, or due to his "innocent" breach of an existing rule.[46] (Testimony of Ralph O.) In view of the totality of the circumstances presented in this matter, the court finds that Ralph O.'s testimony on this subject was often self-serving and inconsistent with other credible evidence. Accordingly, the court ascribes little weight to this aspect of his testimony.[47]
Ralph O. also asserts that the court is precluded from finding that he has failed to achieve statutory rehabilitation because he has met the specific steps assigned to him in August 2000. (Exhibits 2, D, E; Testimony of Ralph O.) The court finds that this assertion is not reasonably based on the evidence presented at trial as despite Ralph O.'s claims it is clear that he has not satisfactorily fulfilled the specific steps at issue. While Ralph O. has, over the years, attended a number of DOC programs, none of the DOC classes addressed the court's order for Ralph O. to participate in the parenting counseling which was clearly required by the August 2000 steps.[48] Accordingly, there is insufficient evidence from which the court could reasonably conclude that Ralph O. has met his parenting counseling obligation. (Exhibit 2.) In addition, the evidence clearly and convincingly establishes that Ralph O. started but did not successfully complete the "Gang Member/Close Custody Program" at Northern CI, despite the program's specific inclusion in the steps imposed in August 2000. Although Ralph O. may argue that he was prevented from completing this program because of the DOC's interference with his rehabilitation process, the evidence clearly and convincingly proves that his program attendance was interrupted as the result of Ralph O.'s own conduct; as found in Part I.B., the fighting incident that occurred in December 2000 constituted a rule violation which, along with his problems dealing with gang members at Northern CI, CT Page 13318 led the DOC to transfer the respondent out of the DOC facility where the program at issue was offered, moving him to Cheshire CI. (Exhibits 4, 5; Testimony of Michael R., Jeff C.) Furthermore, the specific steps required that Ralph O. have "no involvement . . . with the criminal justice system." The court reasonably concludes that Ralph O. violated this step by engaging in fighting at Northern CI in December 2000, which resulted in the delivery of analogous penalties by the DOC, as described in Part I.B.
Even if it could reasonably be found that Ralph O. has sufficiently complied with the August 2000 steps, this aspect of Ralph O.'s opposition to the TPR allegations must fail, as it is based upon the erroneous assumption that compliance with specific steps in and of itself establishes that a parent has achieved § 17a-112 (j) (3) (B) rehabilitation. While satisfactory compliance with specific steps may indicate some degree of rehabilitation, such compliance is not dispositive of TPR allegations. Our courts have long recognized that "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether thosefactors were included in specific expectations ordered by the court or imposed by the department. See In re Michael M., 29 Conn. App. 112, 125,614 A.2d 832 (1992); see also In re Migdalia M, 6 Conn. App. 194, 206,504 A.2d 533, cert. denied, 199 Conn. 908, 508 A.2d 770 (1986)." (Emphasis added.) In re Vincent D., supra, 65 Conn. App. 670. Accordingly, even if it could be reasonably found that Ralph O. did satisfy the specific steps at issue, "successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." Id.
Moreover, the petition of August 7, 2001 alleges § 17a-112 (1) (3) (B) (1) as the statutory basis of its failure to rehabilitate claim against Ralph O.[49] The text of the allegation contains no reference to specific steps, as it mirrors the language of § 17a-112
(c) (3) (B) (1), as amended by P.A. 00-137 and P.A. 00-196, effective on October 1, 2000 and codified as § 17a-112 (j) (3) (B) (1).[50] The respondent apparently presumes that the operative statutory ground requires the petitioner to prove that the respondent had "been provided specific steps to take to facilitate the return of this child to the parent. . . ." § 17a-112 (j) (3) (B) (2). However, as has been thoughtfully reasoned in another termination case. "[t]he legislative mandate of [§ 17a-112 (p)] to construe the provisions of the termination statute `liberally . . . in the best interests of any child for whom a petition under this section has been filed' . . . firmly supports the conclusion that specific steps need not be provided whereCT Page 13319the basis of a failure to rehabilitate claim is a prior adjudication ofneglect." (Emphasis added.) In re Marcus Anthony R., Superior Court for Juvenile Matters, Child Protection Session (June 28, 2001, Frazzini,J.).
A liberal construction of the termination statute would require the court to acknowledge that the reference to specific steps, now contained in § 17a-112 (j) (3) (B) (2), originated with Section 8 ofPublic Act 98-241.[51] Through that act, the TPR statute was amended to include a statutory basis for terminating parental rights where a child had not previously been adjudicated neglected or uncared for, as occurs when coterminous neglect/uncared for petitions are filed contemporaneous with the filing of TPR petitions. See Practice Book Sec. 33-12. For cases where coterminous petitions were at issue, P.A. 98-241 added new language providing that parental rights could be terminated when the child at issue " (2) is found to be neglected or uncared for and has been in the custody of the Commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child pursuant to Section 46b-129, as amended by this act. . . ." In view of this historical development, it is logical and reasonable to construe § 17a-112 (j) (3) (B) (1) in a manner which is both liberal and consistent with the text of P.A. 98-241, unencumbered and unsullied by technical redesignations or clerical errata that have apparently graced subsequent editions of the statute. See In re Shyliesh H., supra,56 Conn. App. 167 n. 3. For all these reasons, in the present case, where the petitioner has clearly alleged Ralph O.'s failure to achieve rehabilitations with reference the grounds established by § 17a-112
(j) (3) (B) (1), the court declines to adopt the constraining statutory construction proposed by the respondent, but finds that the petitioner has proved Ralph O.'s failure to achieve rehabilitation, clearly and convincingly, and notwithstanding any degree to which he may have complied with the specific steps of August 2000.
Finally, Ralph O. has submitted a broad-based attack on the constitutionality of § 17a-112 (j) (3) (B). He argues that the text of the statute "is unconstitutionally vague because it fails to put the respondent father on notice as to what is expected to prevent his parental rights from being terminated." Father's Brief. Upon review, the court concludes that Ralph O. has failed to meet his burden of demonstrating "beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. Sweetman v. State Elections Enforcement Commission,249 Conn. 296, 322, 732 A.2d 144 (1999)." State v. Hopkins,62 Conn. App. 665, 675-76, 772 A.2d 657 (2001). See also In re ShylieshCT Page 13320H., supra, 56 Conn. App. 181, Accordingly, the court declines to accept this aspect of Ralph O.'s argument in opposition to the termination of his parental rights.[52]
As noted by the respondent father, the void for vagueness doctrine accords due process protection in child protection matters in that it "requires statutes (1) to provide fair notice of the conduct governed by them and (2) to prescribe minimum guidelines to govern law enforcement." (Citations omitted.) In re Shane P., 58 Conn. App. 244, 253, 754 A.2d 169
(2000) (rejecting claim of unconstitutionality as to abandonment statute [now § 17a-112 (j) (3) (A)]). "`Legislative enactments carry with them a strong presumption of constitutionality, and a party challenging the constitutionality of a validly enacted statute bears the weighty burden of proving unconstitutionality beyond a reasonable doubt. . . . In analyzing the constitutionality of a statute, the court will read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it.'" In re Shane P., supra, 58 Conn. App. 254, citing In re Shyliesh H., supra, 56 Conn. App. 178. "If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Internal quotation marks omitted; citation omitted. State v. Burton, 258 Conn. 153,159, 778 A.2d 955 (2001). "A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions, nor is it necessary that a statute list the exact conduct prohibited. . . . The constitution requires no more than a reasonable degree of certainty. . . . High standards of precision in the parentaltermination arena are neither achievable nor desired, as theacceptability of specific conduct and the determination of whether toterminate parental rights is a highly fact-specific process." (Emphasis added; citations and quotation marks omitted.) In re Shane P., supra,58 Conn. App. 254.
With these principles in mind, the court turns to the facts and circumstances of Ralph O.'s claim that § 17a-112 (j) (3) (B) is void for vagueness.[53] In so doing, the court's initial inquiry is whether the legislation provided the respondent with sufficient notice and warning of the conduct necessary to avoid a finding of failure to achieve rehabilitation. In re Shane P., supra, 58 Conn. App. 254; In re ShylieshH., supra, 56 Conn. App. 179-180. Insofar as the statutory ground of failure to achieve rehabilitation is concerned, guidance exists for a parent facing TPR allegations. See In re Shane P., supra, 58 Conn. App. 256;In re Shyliesh H., supra, 56 Conn. App. 180. As written and as repeatedly interpreted in our case law, § 17a-112 (j) (3) (B) clearly cautions a respondent in a TPR proceeding that he must achieve "restoration . . . to CT Page 13321 his or her former constructive and useful role as a parent" in order to avoid termination of parental rights.[54] In re Eden F., supra,250 Conn. 706; see also In re Amneris P., supra, 66 Conn. App. 384-85; Inre Ashley S., supra, 61 Conn. App. 665; In re Sarah Ann K.,57 Conn. App. 448; In re Shyliesh H., supra, 56 Conn. App. 180. As discussed herein, our courts have repeatedly admonished that when assessing whether a respondent has been restored to a constructive and useful role as a parent, achieved restoration, "the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." In re Shyliesh H., [supra,56 Conn. App. 180]." In re Sarah Ann K., supra, 57 Conn. App. 448; see also In re Amneris P., supra, 66 Conn. App. 384-85; In re Ashley S., supra, 61 Conn. App. 665. Thus, the express reference to "the age and needs of the child" contained in § 17a-112 (1) (3) (B) "establishes explicit standards for the enforcement of the statute." In re ShylieshH., supra, 56 Conn. App. 180. Accordingly, § 17a-112 (j) (3) (B), as amended, is on its face precise enough to "provide a fair warning of the conduct necessary for personal rehabilitation and further provides minimum guidelines for enforcement of the statute." In re Shyliesh H., supra, 56 Conn. App. 181. Accordingly, the statute is not unconstitutionally vague as written. Id. See also In re Shane P., supra,58 Conn. App. 254-55; also State v. Burton, supra, 258 Conn. 161.
Ralph O. also argues that § 17a-112 (j) (3) (B) has been applied to him in an arbitrary fashion, with neither "fair notice of the conduct he must address nor . . . minimum guidelines to govern [the statute's] enforcement." Father's brief. The respondent's brief gives but scant attention to the manner in which the statute was applied to him, and "he provides no analysis in support of his allegation of a due process violation."[55] In re Shane P., supra, 58 Conn. App. 250. Still, the facts of the case make it clear that Ralph O. failed to satisfy the specific steps that were established by the court in August 2000, as guidelines to be used in measuring any degree of rehabilitation that he may have achieved. In re Shane P., supra, 58 Conn. App. 253. As fully discussed herein, Ralph O.'s own misconduct caused him to be unable to complete the "Northern Correctional Institute's Gang Member/Close Custody Program." (Exhibit 2.) He similarly failed to complete the minimum criteria that included parenting education, and he engaged in fighting while the steps were pending, evincing misconduct that was a clear violation of both the spirit and the letter of these guidelines. Ralph O. was clearly warned by the steps about what was, and what was not, acceptable conduct, and he failed to abide by such warnings. Even in the absence of the steps, it is abundantly clear that to assume the role of a responsible parent for Jennifer, Ralph O. would have to be available to CT Page 13322 her, at liberty and in a position to provide care, support, safekeeping and nurturance for this child. The facts of this case make it obvious that Ralph O. is simply not now available to perform in this capacity. Furthermore, as found in Part I.B. and herein, this respondent is not likely to be available to function as a parent for a prolonged period of time, even after his discharge from prison. As such, he cannot prevail on his claim that § 17a-112 (j) (3) (B) (i) is unconstitutionally vague as applied to him under the circumstances of this case.
In the absence of any constitutional infirmity to the statutory ground for termination of parental rights at issue, based on the totality of the clear and convincing evidence in this case, the court determines that despite some efforts at rehabilitation Ralph O. remains without the qualities necessary to successfully parent his daughter. The evidence, taken as an entirety, compels the conclusion that this respondent lacks the ability to assume a responsible position in his daughter's life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Ralph O.'s failure to achieve rehabilitation pursuant to § 17a-112 (j) (3) (B).
II.C. STATUTORY GROUNDS FOR TERMINATION — LACK OF ONGOING PARENT-CHILDRELATIONSHIP — § 17a-112 (j) (3) (D)
The petitioner next alleges that no ongoing parent-child relationship exists between Ralph O. and Jennifer, and that the child's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112 (j) (3) (D).[56] Ralph O. argues that the father-daughter relationship was extant in this case during the adjudicatory period of 1997 through August 7, 2000, so that the ground at issue cannot be satisfactorily proved.[57] Applying the requisite legal standards, and construing the statute in accordance with § 17a-112
(p), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Ralph O. and Jennifer.[58]In re Jonathon G., supra, 63 Conn. App. 525. In answering this question, Ralph O. urges the court to limit its consideration "to events preceding the filing of the petition . . . [on] August 7, 2001." Post-Trial Brief of Respondent, filed June 18, 2002 (Father's Brief). Using this measure, it is overwhelmingly apparent a parent-child relationship could not be and was not developed or maintained during the period in question because of Ralph O.'s continued incarceration. As found in Part I.B., Ralph O. was imprisoned in 1992, when his daughter was two CT Page 13323 years old: he has never had a relationship with her outside of that context. (Exhibit 3.) During the seven months that Ralph O. was confined at Northern CI, from July 2000 through January 2001, Ralph O. expressly declined the opportunity to have visits with Jennifer, because the prison facility required that they have no physical contact, but remain separated by a glass partition.[59] (Exhibit 1.) On other dates prior to the submission of the pending TPR petition, sanctions and penalties imposed on Ralph O. by the DOC as the result of his repeated disruptive conduct while incarcerated, along with the respondent's frequent transfers from prison to prison, rendered visitation impracticable to the point of unreasonableness, as described in Parts I.B. and II.A.[60] The evidence clearly and convincingly establishes that the lack of a parent-child relationship during the period preceeding the filing of the TPR petition is directly attributable to Ralph O.'s long involvement with the criminal justice system: the respondent's own criminal activity caused his long-term incarceration, led to the need for transporting Jennifer for long distances to participate in visitation, and in effect rendered him unavailable to serve as a parent for his daughter.[61]
Thus, it was as a result of his own actions that Ralph O. has never "met on a day to day basis the physical, emotional, moral and educational needs of the child." § 17a-112 (j) (3) (D). As further result, other than on a biological basis, Ralph O. had never had a "parenting" relationship with his child, within the meaning of the statute.[62] SeeIn re Shane P., 58 Conn. App. 234, 241, 753 A.2d 409 (2000).
Again utilizing the respondent's measure, in deciding whether a parent-children relationship, within the meaning of § 17a-112 (j) (3) (D), the court must also determine whether Jennifer maintained any feelings for Ralph O. prior to August 7, 2001 and, if so, whether those feelings were of a positive nature, connoting positive emotional aspects of a parent-child relationship.[63] In re Jessica M., supra,217 Conn. 470; In re Jonathon G., supra, 63 Conn. App. 525. While Jennifer maintained some emotional connection with Ralph O. during this period, overall her feelings for him cannot properly be identified as "positive" within the meaning of In re Jessica M., supra. Ralph O. correctly submits that prior to the date on which the TPR petition was submitted Jennifer did have some feelings for her father and she retained some keepsakes which he had sent to her in the past.[64] However, the evidence clearly and convincingly indicates that prison visits had a significantly negative effect upon the child; her fears and anxiety were especially raised when the conditions of Ralph O.'s confinement required that he meet with Jennifer while they were separated by a DOC glass partition. Jennifer did not enjoy her visits with Ralph O. prior to the fall of 2001, often returning in tears.[65] In fact, during the adjudicatory period as defined by Ralph O., Jennifer was only comfortable CT Page 13324 while in her father's company during limited, supervised meetings outside the prison setting, such as during a psychological evaluation. (See Exhibits F, I; Testimony of Luz O.) Ralph O. himself acknowledges that Jennifer is afraid of him, so that direct contact with the child would be inappropriate during his incarceration. Under these circumstances, the court is constrained to conclude that prior to the submission of the TPR petition, the value of any positive feelings Jennifer may have had for Ralph O. were outweighed by the anxiety she developed in connection with visits that took place at any prison facility where Ralph O. has been in residence.[66] (Testimony of Luz O.)
It is obvious that Jennifer has never known Ralph O. as a parent or as a caregiver; she had seen him very infrequently over the years, and actually knew him only as a person who had been identified as her "father" whom she has visited at the prison. Thus, it cannot reasonably be found that the child maintained any relevant positive feelings for Ralph O. prior to August 7, 2000, sufficient to satisfy the requirements of In re Jessica M., supra, 217 Conn. 470.[67] See also In re JonathonG., supra, 63 Conn. App. 525. This conclusion is consistent with the Appellate Court's clear indication that the fact that a parent "had some contact with [the child in question] does not preclude a determination that there has been no ongoing parent-child relationship . . ." In reKezia M., supra, 33 Conn. App. 12.
In ascertaining that Jennifer has no material positive feelings for Ralph O., the court has further credited the GAL's report that the child's emotional ties to the respondent are minimal at best, limited to the facts that she "does recognize that he is her father, and shows some interest in him because of this" as described by Dr. Grenier. (Exhibit F.) The GAL's report concerning absence of positive feelings for Ralph O. is consistent with the information obtained by the court in meeting with Jennifer, and is also consistent with Dr. Grenier's expert opinion which establishes that Jennifer "has never lived with or come to rely on [the respondent] as her psychological parent."[68] (Exhibit F.) Taken in its entirety and strictly construing Practice Book Sec. 33-3, the evidence reflects only that during the adjudicatory period Jennifer had but minimal feelings for Ralph O. The child's scant emotional concern with Ralph O. constitutes no more than a polite, friendly relationship; it does not approach a bond which a child would have developed with a parent who has consistently expressed love, affection and responsibility for her care and well-being. Objectively viewed, Jennifer's feelings for her father do not meet the test of "feelings of a positive nature only" established by In re Jonathon G., supra, 63 Conn. App. 525 and In reTabitha T., supra, 51 Conn. App. 601-602. The clear and convincing evidence thus leads the court to conclude that no positive aspects of the CT Page 13325 father-daughter relationship survived prior to submission of the TPR petition in August 2001.[69] In re Jessica M., supra, 217 Conn. 470.
As it is thus apparent that no parent-child relationship exists between Ralph O. and Jennifer, the court is next called to assess whether it would be detrimental to the childs' best interests to allow additional time for a parenting relationship to be developed.[70] In re JonathonG., supra, 63 Conn. App. 525. In this regard, the court has considered the evidence which reflects that although Jennifer was extremely happy immediately following a visit with Ralph O. in late 2001, her enthusiasm was directly related to the respondent father's ill-advised efforts in gaining the child's trust by promising to purchase a home in which father and daughter would live together with Sandra, whom he proposed to adopt. However, as found in Part I.C., there was no realistic basis for Ralph O.'s, representation that he could adopt Sandra, and his lengthy remaining period of incarceration effectively extinguishes his ability to purchase, within a reasonable period of time, the home, swimming pool and bicycle he had promised. Jennifer was devastated when she learned how she had been misled by her father. (Testimony of Luz O.)[71]
The evidence clearly and convincingly establishes that Jennifer has never really known her father, as he has been in jail for nearly her entire life; as found in Part II.B., he will not be available to serve as an effective parent for this child at any time in the foreseeable future.[72] Although Ralph O. is tenacious, and has been steadfast in his efforts to regain custody of Jennifer, the court must remain cognizant of the fact that the child has been in foster care since 1996. As her lawyer has stated. "[t]he child here is in need of stability and permanency now, not at the unreasonable time of father's release from incarceration in 2005." Child's Brief. Under the totality of the circumstances, it would be unreasonable to expect Jennifer to wait any longer for her father's rehabilitation before she is placed in a position from which a permanent home, with steadfast parenting, can be found for her. As found in Part III.B., Jennifer's best interests will only be served through termination of Ralph O.'s parental rights, so that she can live the remainder of her childhood days free of the disruption that would result if her biological father should again attempt to regain her custody, and free to become legally adopted by a loving, competent and reliable parent.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G., CT Page 1332656 Conn. App. 12, 22, 740 A.2d 496 (1999). As counsel for the minor child has movingly argued. "[s]uch reasoning implies that positive memories may exist of a prior relationship but that, if the relationship is no longer viable, there is no longer an ongoing parent-child relationship." Child's Brief. This construction is applicable to the present case, where the evidence establishes that any valid parenting relationship that Ralph O. may have developed with Jennifer has been definitively lost due to his long periods of incarceration and attendant absence from his daughter's life. As the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between Ralph O. and Jennifer, and that it is not in the best interests of Jennifer to allow more time for her to develop a relationship with her biological father, the petitioner has met her burden of proof under § 17a-112
(j) (3) (D). In re Jonathon G., supra, 63 Conn. App. 525; In re John G., supra, 56 Conn. App. 22.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In re Quanitra M., supra, 60 Conn. App. 103; see also In re Valerie D., 223 Conn. 492,511 and n15, 613 A.2d 478 (1992). In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III.A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., supra, 63 Conn. App. 528.
III.A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (k) (1)
Services for Ralph O. were unnecessary following the April 1999 ruling that such efforts were no longer appropriate; as found in Part I.A., this ruling was made again on December 4, 2000. DCF's provision of services to Ralph O. was rendered impracticable in this case. as he was incarcerated during nearly all of Jennifer's life, and moved from institution to institution by the DOC who assumed the role of service provider, as described in Parts I.B., II.A. and II.B.
III.A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112CT Page 13327(k) (2)
As found in Part II.A., the clear and convincing evidence in this matter proves that Ralph O. is neither able nor willing to benefit from such reunification services as are contemplated by the federal Adoption Assistance and Child Welfare Act of 1980, as amended. See also Part II.A., above, referencing the court's previous rulings that such efforts are not appropriate in this case.
III.A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k) (3)
As described in Part II.B., Ralph O. attended some programs sponsored by the DOC, but he has not completed the parenting counseling or the "close custody" course prescribed by the August 2000 specific steps. In addition, Ralph O. engaged in fighting in December 2000, resulting in the imposition of multiple sanctions from the DOC. Thus, as a practical matter, he violated the steps' prohibition against "further involvement with the criminal justice system." (Exhibit 2.)
III.A. 4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112 (k) (4)
Jennifer's scant feelings for and ties to Ralph O. are described in Part II.C. The child is firmly bonded to her half-sister, Sandra, with whom she has long resided in foster care. (Testimony of Luz O.) Jennifer calls Jacqueline, her foster mother "Mom," and views her in that capacity.
III.A. 5. AGE OF THE CHILD — § 17a-112 (k) (5)
Jennifer was born on July 1990: she is twelve years old.
III.A. 6. PARENT'S EFFORTS TO ADJUST HIS CIRCUMSTANCES — § 17a-112(k) (6)
Ralph O. has not maintained adequate contact with Jennifer, nor with the foster parent or DCF regarding the status of his child. In view of the fighting in which he participated while incarcerated in December 2000 and his concomitant failure to complete the "close custody" course offered at Northern CI, the court further finds that Ralph O. has not made realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. Given the length of time he will remain incarcerated, tendering additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited with him.
III.A. 7. EXTENT TO WHICH THE PARENT WAS PREVENTED FROM MAINTAININGCT Page13328 A RELATIONSHIP WITH THE CHILD — § 17a-112 (k) (7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented Ralph O. from maintaining a relationship with the child at issue in this case, nor did the economic circumstances of the parent cause prevent such relationship, although the limitations and restrictions inherent in the foster care system and DOC remained in effect. See Parts I.B. and II.A.
III.B. BEST INTERESTS OF THE CHILD — § 17a-112 (j) (2)
The court is next called upon to determine whether termination of the parental rights of Ralph O. would be in Jennifer's best interests.[73]
Applying the appropriate legal standards[74] to the clear and convincing facts of this case, the court finds this issue in favor of the petitioner.
In determining whether termination of Ralph O.'s parental rights would be in Jennifer's best interests, the court has examined multiple relevant factors, including the child's interests in sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with her foster parent and biological parent; and the degree of contact maintained with her biological father.[75] In re Alexander C., 60 Conn. App. 555,559, 760 A.2d 532 (2000); In re Shyina B., 58 Conn. App. 159, 167,752 A.2d 1139 (2000); In re Savanna M., supra, 55 Conn. App. 816. In a matter such as this, the court is further called upon to balance Jennifer's intrinsic need for stability and permanency against the benefits of maintaining a connection with her biological father. SeePamela B. v. Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Jennifer's best interests to continue to maintain any legal relationship with Ralph O. As found in Parts I.B. and II.B., the evidence clearly and convincingly establishes that the respondent will be incarcerated for several more years before he will be eligible for release. While he is serving his lengthy sentence, he is simply not going to be available to serve as a parent to Jennifer. Even after Ralph O. is released from prison, he will lack the attributes and characteristics necessary to fulfilling a valid parental role, and much additional time will likely be required before he will be able to conform his behavior to societal norms, as is made clear through his conduct in prison, and the other evidence described in Part II.B. Ralph CT Page 13329 O.'s use of unfounded alluring promises in an attempt to gain Jennifer's trust and to establish a bond with the child at a visit in the fall of 2001 well-illustrates his poor judgment when it comes to such vital parenting issues as communication with and motivation of a child such as Jennifer, with special psychological needs.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). The court is constrained to agree with the GAL and Jennifer's counsel, and concludes that the clear and convincing evidence in this case establishes that the child at issue in this case is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of her biological father as a caretaker.
In delivering his report to the court in the course of trial, Jennifer's GAL urged termination of Ralph O.'s parental rights, opining that this action would serve the child's best interests, so that she can be adopted into a permanent home. This report was based on his knowledge of this articulate child and his consideration of Jennifer's extreme discomfort when visiting Ralph O. in prison, her lack of any positive memories of her biological father, her disinclination to maintain contact with him, and her stated desire to live permanently with Sandra and her present foster mother in short, the GAL's report was fully consistent with the evidence. Jennifer herself desperately wants things to remain as they are with regard to her friends, her school, and her current placement; her therapist has opined that any change in her current placement could result in a significant adverse affect on the child's present stability, undermining the progress she has made in the past year. (Exhibit 6; Testimony of Karyn E.) Jennifer's attorney has accordingly argued vigorously in favor of terminating Ralph O.'s parental rights, and has requested the court to sever the child's legal ties to her biological father so that she may proceed to adoption. Absolutely no evidence to establish the unreasonableness of this request was received by the court.
Having balanced Jennifer's intrinsic need for stability and permanency against the benefits of maintaining a connection with Ralph O., the clear and convincing evidence in this case establishes that this child's best interests cannot be served by continuing to maintain any legal relationship to the respondent. Pamela B. v. Ment, supra, CT Page 13330244 Conn. 313-314. Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Ralph O. is in the best interest of the child Jennifer O.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of Jennifer's sense of time, her need for a secure and permanent environment, the relationship she has with her foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Ralph O. are hereby terminated as to the child Jennifer O.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Jennifer for the purpose of securing an adoptive family or other permanent placement for her.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of Jennifer shall be offered to her current foster parent.
BY THE COURT,
N. Rubinow, J.